MENCKE v. A CARGO OF SUGAR EX BRITISH SHIP BENLARIG et al.

(District Court, E. D. New York. January 16, 1900.)

**1. SHIPPING—DISCHARGE OF CARGO—NECESSITY OF LIGHTERAGE.**

A ship cannot be required to submit to being dismantled or mutilated in order to discharge her cargo under a charter, but, where she cannot approach the place of discharge designated by the charterer without such mutilation, the cargo should be lightered; the liability for the expense of lighterage to be determined by the custom of the port or the terms of the charter.

**2. SAME—CONSTRUCTION OF CHARTER—EXPENSE OF LIGHTERAGE.**

A British ship was chartered to carry a cargo of sugar from Java. The charterers, as permitted by the charter, designated New York as the port of discharge; and the ship proceeded to that port, approaching it by the customary route from Java. The charter provided that the ship should deliver the cargo "so near the port of discharge as she may safely get, and deliver the same, always afloat, in a customary place and manner, in such dock as directed by the charterers." It further provided that the goods were to be taken from alongside the ship at the charterers' risk and expense, and that lighterage, if any, to reach the port of destination, or to deliver the cargo at such port, should be paid by the receivers. notwithstanding any contrary custom of the port. The dock designated as the place of discharge was above the Brooklyn Bridge, under which the ship was unable to pass without cutting off the tops of her masts, which were unusually high and immovable. *Held*, that under the charter she could not be required to go to such dock, and that it required the expense of lightering her cargo to be paid by the receivers.

This was a suit in admiralty by the master of the British ship Benlarig to recover a balance of freight under a charter.

Convers & Kirlin (Mr. Kirlin, of counsel), for libelant.

Butler, Notman, Joline & Mynderse (Mr. Brown, of counsel), for claimants.

THOMAS, District Judge. The Benlarig was chartered in London, July 1, 1898, by her owners, to Erdmann & Sielcken, of Batavia, to

carry a cargo of sugar from Java. The charter party, among other things, states that the vessel—

"Being so loaded (and dispatched), shall (unless ordered to a direct port of discharge, on signing last bills of lading) therewith proceed to Barbadoes, thence Queenstown or Falmouth (as directed by charterers or their agents), for orders, to discharge, always afloat, either at a safe port in the United Kingdom, or on the continent of Europe between Havre and Hamburg (both included), Rouen excluded, or, at option of charterers, to order vessel from Barbadoes, to proceed to Delaware Breakwater for orders, to discharge at New York or Boston or Philadelphia or Baltimore, or so near the port of discharge as she may safely get, and deliver the same, always afloat, in a customary place and manner, in such dock as directed by charterers, agreeably to bills of lading, on being paid freight in full of all port charges, pilotage, and primage as customary at port of discharge," etc.

### Section 4 of the charter party provides:

"All goods to be brought to and taken from alongside of the ship, always afloat, at the said charterers' risk and expense, who may direct the same to the most convenient anchorage; lighterage, if any, to reach the port of destination, or deliver the cargo at port of destination, remains for account of receivers, any custom of the port to the contrary notwithstanding."

From Batavia the ship went to Barbadoes for orders, pursuant to which she came to New York. Bills of lading had been issued for the cargo, making it deliverable at the port of discharge, as per charter party, to Messrs. Winter & Smillie, as agents, or to their assigns; he or they paying freight for the said sugar, as per charter party. The ship's documents were delivered to Czarnikow, MacDougall & Co., of New York, who transferred the same to the claimants. After due notice of the ship's arrival, the claimants gave orders in writing for the discharge, above the Brooklyn Bridge, at their refinery at the foot of Pearl street, Brooklyn. As the master considered that two of the ship's masts would not go under the bridge, arrangements were made between the parties for delivering the cargo by lighters, and payment of the expense thereof was deferred for subsequent determination. The question here is whether such expense should fall upon the libelant or claimants.

The Benlarig was a square-rigged iron ship. Her three masts were built up solid from the bottom to the top, and were composed of cylindrical plating riveted together, and internal, transverse, angle-iron braces. The mainmast was 139 feet 10 inches above the deck, and the deck was 5 feet $2\frac{1}{2}$ inches above the deep-water load line at the mainmast, making the total height of that mast 145 feet and $\frac{1}{2}$ inch. The foremast was 136 feet 8 inches above the deck, but the height of the deck above the water line at that part of the ship is about 7 feet, so that the height of this mast was 143 feet 8 inches. The mizzenmast was 129 feet above the deck, which was 7 feet above the water line, so that the height of the mizzenmast from the water was 135 feet. The clear height of the Brooklyn Bridge above mean high water is 135 feet, and the mean rise and fall of the tide is $4^5/_{10}$ feet. At dead low water the ship could not pass under the bridge without cutting off about 5 feet from the mainmast and foremast, while safety required greater removal from such masts, to avoid the effect of any disturbance of the water. After the ship should have been discharged, it would be necessary to cut off an additional portion

of such masts, and also some part of the mizzenmast, to allow her to repass under the bridge, unless a return cargo could have been taken above the bridge, or the ship could have gone out by the East river and Long Island Sound. There were but two means of escaping this mutilation of the masts, for the purpose of discharging the cargo. One was by approaching New York from the east, through Hell Gate. All shipping experts called by the claimants testified that they never had heard of a ship from Java pursuing that course. It may therefore be concluded that such alternative was contrary to the expectation and understanding of all parties to this contract, or of any other contract for the carriage of sugar from Java. The remaining alternative was to lighter the sugar, and the question is upon which party the expense of such lighterage should fall. It is quite exceptional for a ship to have immovable masts so high that she cannot pass under the bridge, and there is no custom or practice known among shipping merchants respecting such a case. This is the concurring testimony of all the witnesses called by the claimants. Before considering the charter party, it should be stated that the ship had been before at the port of New York, and the owners well knew that she could not pass under the bridge without disturbing her masts. It is not understood that the charterers had this knowledge. On the other hand, there is no notice to the ship that it would be necessary to discharge the cargo above the bridge, although in fact about 75 per cent. of the sugar now received at this port is so discharged. If this knowledge of the owners be urged against them, it may be answered that for this very reason they may have considered themselves protected by the terms of the charter party, and in fact all previous notice or understanding by either party must be regarded as merged in the charter party, and to the interpreting of that instrument resort must be had to ascertain the relative rights.

The charter is stated by a witness connected with claimants' factory to be the same charter usually employed in the Java sugar trade, although the words "always afloat" seem to have been interlined in the fourth subdivision. The essential question is whether the provisions of the charter already quoted relieve the ship from delivering cargo above the bridge. For whatever purposes such stipulations were originally embodied in charter parties, they have been retained and adopted for use in view of existing structures, and it is considered that the provisions are sufficiently broad to relieve the ship. This conclusion is reached through no ingenuity of construction, but by giving to the language the meaning which might be gathered ordinarily from the words used. The initial agreement in the charter is to deliver the cargo at one of several ports, "so near the port of discharge as she may safely get, and deliver the same, always afloat, in a customary place and manner, in such dock as directed by charterers." This provision seems to be a direct stipulation to deliver the goods at any place where the ship might float, in such dock as directed by the charterers, in a customary place and manner, when such dock shall have been reached. The evident intention is that the ship shall go to the designated port, if she can get there in safety; and the continuing thought seems to be that she shall deliver the goods in a dock

designated by the charterers, in a customary place and in a customary manner. Any intelligent construction would seem to demand that the ship could not be ordered to a dock where it would be unsafe for her to go, whether the danger arose from the depth of water or any other cause. For instance, the ship could not be ordered to a slip which was too narrow to receive her, or where there was some overhanging shed or house that would prevent. So, if the entrance to the dock was obstructed, or there was other interference with the discharge at the place designated. But section 4 is explicit, and states that the goods are to be taken from alongside the ship at the charterers' risk and expense, although they are permitted to direct her to the most convenient anchorage, and that any lighterage, either to reach the port of destination or to deliver the cargo at such port, shall be paid by the receivers, notwithstanding any contrary custom of the port. Now, lighterage was necessary for the purpose of delivering this cargo after the ship reached the port of destination, for the reason that the ship could not make the delivery without such lighterage, unless she was mutilated by the cutting off of her masts. The proposition then is: If the charterers stipulate to pay the lighterage necessary for the purpose of delivering the cargo, may they be excused from observing this agreement upon the plea that no lighterage would be necessary if the masts of the ship were cut down to a certain length? It is thought that it is the privilege of the ship to be preserved from self-mutilation, and that she need not be crippled, deformed, or dismantled for the purpose of delivering her cargo. Apparently that should never be required. It should not be expected. Rather than that, it is expectable that the cargo should be lightered by the shipowners, and that they would pay for the same. But the expectation as to the person upon whom the payment of the lighterage should fall changes when it appears that there is a stipulation that the receivers shall themselves pay the lighterage. It is useless to conjecture respecting these stipulations, where they are, as in the present case, unambiguous. It is better to take words at their apparent and ordinary meaning, and hold parties to their agreement according to the plain sense of the language used. Adopting such rule, the libelant should recover.

Since the trial of this case the attention of the court has been called to In re Arbitration between Goodbody & Co. and Balfour, Williams & Co., 8 Asp. 303, pt. 7 (Nov., 1899). In that case a cargo had been sold to arrive by the steamer Vanduara, on condition that the bills of lading should provide for its delivery "at any safe port in United Kingdom of Great Britain, * * * vessel to discharge afloat." The bills of lading provided that the cargo should be delivered "at any safe port in the United Kingdom, Manchester excepted"; and the vendee refused to accept the documents, upon the ground that they did not comply with the contract for delivery at any safe port in the United Kingdom. It was found that the Vanduara, when loaded with the said cargo, would have been unable to go up the Manchester Ship Canal to the Manchester Docks without dismantling the ship, because the heads of her main and mizzen masts would be higher than the limit fixed by the canal company's regulations for passing under

the Runcorn Bridge. Runcorn Bridge is about 24 miles from Manchester, and about 12 miles from the entrance of the canal. In the opinion this language was used:

"It was contended on behalf of the sellers that Manchester was not a safe port for the Vanduara, because the height of her masts-prevented her getting to Manchester, and that therefore the words in the charter party and the bill of lading, 'Manchester excepted,' did not amount to a variance from the terms of the contract, because, as Manchester was not a safe port for the ship, she could not in any case have been ordered there."

In the opinions it is stated:

"She could not have been ordered to Manchester in any case, because she could not have got under Runcorn Bridge, and the presentation of documents containing the words 'Manchester excepted' imposed no restriction upon the purchaser inconsistent with the terms of the contract of purchase. * * * I may observe that the contract was for a cargo per Vanduara, a named ship; and if, in point of fact, Manchester was not a safe port for her, it does not seem to me that the defendants were in any way prejudiced by a phrase being introduced into the document which abridged none of their rights, and imposed no restriction which was not imposed by the terms of the contract itself." Again: "It is clear that Manchester, in the limited sense, cannot be a safe port for a vessel which, in order to reach it, must be wholly dismasted."

In the above case it appears that the port was sufficiently safe, but that the canal was crossed by a bridge which prevented the ship from reaching the port in safety unless she were dismantled. In the present case the facts are equal, and, in addition, the parties have stipulated that the receivers should bear the expense of the lighterage,—an element which was lacking in the instance to which attention has just been called. The skillful argument of the claimants gives a totally different meaning to the charter party. If what appears to the court to be a plain statement of duties in this instance favorable to the libelant has quite other significance, yet it would be considered that the claimants should not succeed. The ship stipulated to deliver the cargo at one of many ports; and while it was undoubtedly her duty, after arriving at a designated port, to go to such point therein as she could safely, it is thought that she would not be obliged to go to such point in the harbor at the peril of injury, or at the sacrifice caused by mutilation of her masts. It seems that, in selecting a convenient dock for discharging in a harbor, the receivers of the cargo must select one which the ship can physically approach; and, if there be a permanent structure in the way, the conception that the ship should not encounter this would seem to enter into the spirit and understanding of their agreement. The libelant should have a decree for the balance of the unpaid freight, with costs.